**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAMANTHA HORTON, TAYLOR JESKE, ALLA RADA, LYNNMARIE SEMENZA, KENZA WOODS, and KIMBERLY CALLAN, individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br><br>v.<br><br>PREMIUM BRANDS OPCO, LLC D/B/A LOFT and ANN TAYLOR,<br><br>   Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Samantha Horton, Taylor Jeske, Alla Rada, Lynnmarie Semenza, Kenza Woods, and Kimberly Callan ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Premium Brands Opco, LLC d/b/a Loft and Ann Taylor ("Defendant" or "Loft/Ann Taylor"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

**NATURE OF THE ACTION**

1. In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

1

2.    Premium Brands Opco, LLC operates commercial websites https://www.loft.com/ and https://www.anntaylor.com/, (the "Websites"), through which users browse and purchase a variety of apparel and accessories, including clothing, footwear, and seasonal collections; explore curated styles and promotions; locate and interact with nearby retail locations; access styling inspiration and product information; create and manage user accounts; and take advantage of exclusive offers, discounts, and loyalty programs. Like many modern websites, the Websites displays a cookie banner (the "Cookie Banner") and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Websites share with third parties.

✕

Our website uses cookies and tracking technologies to improve performance, personalize advertising and web experiences, and share content to social media.  Click Manage Preferences to learn more, to opt out of some cookies, or to manage how we or third parties collect, use, and share your non-essential cookies and similar technologies.  If you do not toggle off Advertising and Functional Cookies you agree to (i) use and storage of cookies and tracking technologies as described in our Privacy Policy, and (ii) our Terms of Use.  If you make no selection, your cookie settings will remain unchanged.



*Figure 1 – Cookie Banner of the Websites and Cookie Settings of the Loft and Ann Taylor websites respectively, representing that users could change tracking behavior through Cookie Settings*

3.      The Websites begin placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Websites, before they can interact with the Cookie Banner or select their preferences in the Cookie Settings.

4.      The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on users' behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Websites.

5.      The Websites offer users the ability to disable non-essential cookies and disable the sale and/or disclosure of their personal data by accessing the "Manage Preferences" button in the Websites' Cookie Banners, allowing only "Strictly Necessary Cookies" by switching all other categories of cookies from "Active" to "Inactive," and then clicking the "Save Settings" button. The Websites represent that these actions limit the Websites' use of cookies only to those strictly necessary for the Websites to function.

6.      However, even after users affirmatively reject all but "strictly necessary cookies," the Websites continue to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools.

These companies include Google, LLC ("Google") and Salesforce (collectively referred to herein as the "Tracking Entities").

7. The Websites' Cookie Banners and Cookie Settings are deceptive because the Websites continue to use Tracking Tools that intercept and transmit users' Sensitive Information to Tracking Entities after users affirmatively reject all but strictly necessary cookies. The Websites' design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit users' data constitute an invasion of privacy, an intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanics effectively deprives users of control over their Sensitive Information and their privacy.

8. In short, via the Websites' Cookie Banners and Cookie Settings, Defendant materially misleads users about the use and sale of their data, lulling them into a false sense of security, privacy, and control while simultaneously enabling Tracking Entities to monitor, intercept, and transmit their online behavior in real time. Such conduct deprives users of control over their Sensitive Information and violates fundamental privacy protections.

9. Plaintiffs' experience reflects the conduct described above. Plaintiffs, residents of Arkansas, California, Illinois, New Jersey, Maryland, and Ohio, respectively, visited Defendant's Websites in or around 2025 and 2026 for ordinary consumer purposes, including browsing and comparing products, ordering products, and otherwise navigating the Websites' content.

10. While accessing the Websites from their respective home states, Plaintiffs encountered the Websites' Cookie Banners and Cookie Settings. Plaintiffs affirmatively rejected all but "Strictly Necessary Cookies," relying on Defendant's representations that the Tracking Tools would be disabled upon rejection. Despite these actions and expectations, the Websites

deployed Tracking Tools that automatically intercepted and recorded Plaintiffs' Sensitive Information and transmitted Plaintiffs' Sensitive Information to the Tracking Entities.

11. In each instance, Plaintiffs reasonably relied on Defendant's representations regarding cookie controls and privacy protections, yet their Sensitive Information was nonetheless collected and shared without their valid consent. Plaintiffs were thereby subjected to unauthorized disclosure of their communications and deprived of the benefit of the privacy choice that Defendant represented users could make.

12. Defendant invaded Plaintiffs' fundamental right to privacy and fraudulently misrepresented the Websites' data-collection practices by facilitating the Tracking Entities' unlawful interception of and intrusion into Plaintiffs' Sensitive Information. In doing so, Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code §§ 631 (illegal wiretapping) and 638.51 (unlawful use of a pen register or trap and trace device); California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.; California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; the California Constitution at Art. 1, § 1; Ohio's prohibition against unlawful wiretapping and/or interception at OH ST § 2933.52, and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated persons who were harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2510, et seq. This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this

action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

14.    This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

15.    Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

16.    Plaintiff Samantha Horton is, and at all relevant times has been, a citizen and resident of the State of Ohio. Plaintiff Horton accessed and used Defendant's Website (https://www.loft.com/) while physically located in Ohio. Most recently, Plaintiff Horton visited the Website in or about February 2026 for consumer browsing purposes. Plaintiff Horton does not maintain an account with Defendant and has not made a purchase through the Websites. In connection with her visit to Defendant's Website, Plaintiff Horton engaged with the Cookie Banner and Cookie Settings and rejected all non-essential cookies, allowing only "Strictly Necessary Cookies." Plaintiff Horton relied on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Horton reasonably believed that by rejecting non-essential cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Websites' basic functionality. Despite Plaintiff Horton's affirmative

rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Horton's browsing activity, device identifiers, and related metadata to Tracking Entities. The interception disclosed the substance of Plaintiff Horton's communications with the Websites, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Horton's clear rejection of non-essential tracking technologies. As a result, Plaintiff Horton's Sensitive Information was intercepted, recorded, and transmitted without her consent. Had Plaintiff Horton known that she could not rely on Defendant's misrepresentations regarding cookie controls and/or third-party Tracking Tools, she would not have navigated to, browsed, or used Defendant's Website.

17.    Plaintiff Taylor Jeske is, and at all relevant times has been, a citizen and resident of the State of Illinois. Plaintiff Jeske accessed and used Defendant's Website (https://www.loft.com/) while physically located in Illinois. Most recently, Plaintiff Jeske visited the Website in or about March 2026 for consumer browsing purposes. Plaintiff Jeske maintains an account with Defendant and previously made a purchase through the Website in 2024. In connection with his visit to Defendant's Website, Plaintiff Jeske engaged with the Cookie Banner and Cookie Settings and rejected all non-essential cookies, allowing only "Strictly Necessary Cookies." Plaintiff Jeske relied on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Jeske reasonably believed that by rejecting non-essential cookies, his browsing activity would not be tracked beyond what was strictly necessary for the Websites' basic functionality. Despite Plaintiff Jeske's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Jeske's browsing activity, device identifiers, and related metadata to

8

Tracking Entities. The interception disclosed the substance of Plaintiff Jeske's communications with the Website, including the pages and product information he chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Jeske's clear refusal of non-essential tracking technologies. As a result, Plaintiff Jeske's Sensitive Information was intercepted and recorded without his consent. Had Plaintiff Jeske known that he could not rely on Defendant's misrepresentations regarding cookie controls and/or third-party Tracking Tools, he would not have navigated to, browsed, or used Defendant's Website.

18.    Plaintiff Alla Rada is, and at all relevant times has been, a citizen and resident of the State of Maryland. Plaintiff Rada accessed and used Defendant's Website (https://www.anntaylor.com/) while physically located in Maryland. Most recently, Plaintiff Rada visited the Website in or about March 2026 for consumer browsing purposes. Plaintiff Rada does not maintain an account with Defendant and has not made a purchase through the Websites. In connection with her visit to Defendant's Website, Plaintiff Rada engaged with the Cookie Banner and Cookie Settings and rejected all non-essential cookies, allowing only "Strictly Necessary Cookies." Plaintiff Rada relied on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Rada reasonably believed that by rejecting non-essential cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Websites' basic functionality. Despite Plaintiff Rada's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Rada's browsing activity, device identifiers, and related metadata to Tracking Entities. The interception disclosed the substance of Plaintiff Rada's communications with the Websites, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Rada's

clear refusal of non-essential tracking technologies. As a result, Plaintiff Rada's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Rada known that she could not rely on Defendant's misrepresentations regarding cookie controls and/or third-party Tracking Tools, she would not have navigated to, browsed, or used Defendant's Websites.

19.     Plaintiff Lynnmarie Semenza is, and at all relevant times has been, a citizen and resident of the State of New Jersey. Plaintiff Semenza accessed and used Defendant's Website (https://www.loft.com/) while physically located in New Jersey. Most recently, Plaintiff Semenza visited the Website in or about December 2024 for consumer browsing purposes. Plaintiff Semenza maintains an account with Defendant and has made a purchase through the Website. In connection with her visit to Defendant's Websites, Plaintiff Semenza engaged with the Cookie Banner and Cookie Settings and rejected all non-essential cookies, allowing only "Strictly Necessary Cookies." Plaintiff Semenza relied on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Semenza reasonably believed that by rejecting non-essential cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Websites' basic functionality. Despite Plaintiff Semenza's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Semenza's browsing activity, device identifiers, and related metadata to Tracking Entities. The interception disclosed the substance of Plaintiff Semenza's communications with the Websites, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Semenza's clear refusal of non-essential tracking technologies. As a result, Plaintiff Semenza's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Semenza known that she could not rely on Defendant's misrepresentations

10

regarding cookie controls and/or third-party Tracking Tools, she would not have navigated to, browsed, or used Defendant's Websites.

20.    Plaintiff Kenza Woods is, and at all relevant times has been, a citizen and resident of the State of Arkansas. Plaintiff Woods accessed and used Defendant's Websites while physically located in Arkansas. Most recently, Plaintiff Woods visited the Websites in or about March 2026 for consumer browsing purposes. Plaintiff Woods maintains an account with Defendant and has made purchases through the Websites. In connection with her visit to Defendant's Websites, Plaintiff Woods engaged with the Cookie Banners and Cookie Settings and rejected all non-essential cookies, allowing only "Strictly Necessary Cookies." Plaintiff Woods relied on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Woods reasonably believed that by rejecting non-essential cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Websites' basic functionality. Despite Plaintiff Woods's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Woods's browsing activity, device identifiers, and related metadata to Tracking Entities. The interception disclosed the substance of Plaintiff Woods's communications with the Websites, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Woods's clear refusal of non-essential tracking technologies. As a result, Plaintiff Woods's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Woods known that she could not rely on Defendant's misrepresentations regarding cookie controls and/or third-party Tracking Tools, she would not have navigated to, browsed, or used Defendant's Websites.

11

21.     Plaintiff Kimberly Callan is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Callan accessed and used Defendant's Websites while physically located in California. Most recently, Plaintiff Callan visited the Websites in or about January 2025 for consumer browsing purposes. Plaintiff Callan maintains an account with Defendant and has made purchases through the Websites. In connection with her visit to Defendant's Websites, Plaintiff Callan engaged with the Cookie Banners and Cookie Settings and rejected all non-essential cookies, allowing only "Strictly Necessary Cookies." Plaintiff Callan relied on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Callan reasonably believed that by rejecting non-essential cookies, her browsing activity would not be tracked beyond what was strictly necessary for the Websites' basic functionality. Despite Plaintiff Callan's affirmative rejection of non-essential cookies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Callan's browsing activity, device identifiers, and related metadata to Tracking Entities. The interception disclosed the substance of Plaintiff Callan's communications with the Websites, including the pages and product information she chose to review, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Callan's clear refusal of non-essential tracking technologies. As a result, Plaintiff Callan's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Callan known that she could not rely on Defendant's misrepresentations regarding cookie controls and/or third-party Tracking Tools, she would not have navigated to, browsed, or used Defendant's Websites.

22.     Defendant Premium Brands Opco, LLC d/b/a Loft and Ann Taylor, is a for-profit corporation, with its principal place of business in New York, New York. Defendant sells a variety

of women's apparel, including clothing, dresses, accessories, and related merchandise through its Websites located at https://www.loft.com/ and https://www.anntaylor.com/.

**FACTUAL ALLEGATIONS**

## I.    How Websites Function

23.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

24.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

25.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

26.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

27.    An IP address is "a unique address that identifies a device on the Internet or a local network."[4] In essence, an IP address is defined as follows:

---

[1] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Feb. 17, 2026).
[2] *Id.*
[3]    *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 17, 2026).
[4]    *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 17, 2026).

13

The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[5]

28.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[6]

29.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

30.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[7] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters[8]*

31.    Websites owners or web developers write and manage the URLs for their websites.

---

[5] *Id.*

[6] *Id.*

[7] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section IV.

[8]    *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 17, 2026).

32.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[9] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

33.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[10] Today, UTF-8 is the Internet's most common character encoding.[11]

34.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[12] To demonstrate:



*Figure 3 – Demonstrating URL encoding and decoding[13]*

35.     Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[9] *Id.*

[10]     *HTML       ASCII       Reference,*       W3       SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Feb. 17, 2026).

[11] *UFT-8,* MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Feb. 17, 2026).

[12] *What Is URL Decoding and URL Encoding?,* GOCHYU (last modified Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Feb. 17, 2026).

[13]     Viraj   Shetty,   *URL   Encoding   in   a   few   minutes,*   YOUTUBE   (Sept.   5,   2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Feb. 17, 2026).





*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 6)*



*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

36.     After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the

webpage, which is then processed by the user's browser, as it arrives,[14] and rendered into a visual display according to the instructions of the HTML code.[15] This is the visible, and usually interactable, website that most people think of.

37. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[16]

38. Such complex tasks include streaming videos by users or subscribing to Newsletters/ Digital Magazine, or code used to monitor and report users activity.

39. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website and when and how they do it and with what software and hardware.

40. Unbeknownst to users, as they browse the Websites, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Websites.

---

[14] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 20, 2026).

[15] *What Is a URL?*, MOZILLA, (last visited Feb. 17, 2026).

[16] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Feb. 17, 2026).

**II.    Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookies and Tracking Tools**

41.    Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Websites' programming. Defendant's use of such tools on its Websites is performed pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

42.    The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Websites and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Websites, i.e., everything they view, click on, type, or even hover over.

43.    First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Websites. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

44.    Third-party cookies are placed by domains other than the Websites' domain, such as google.com and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Websites, and across multiple browsing sessions.

45.    As detailed further below, Tracking Tools, including first and third-party cookies, that are placed on users' devices during interactions with the Websites are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Websites' users' Sensitive Information in real time.

46.    Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and the Websites' performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as that Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

47.    Defendant owns and operates the Websites, which allow users to browse and purchase a variety of apparel and accessories, including clothing, footwear, and seasonal collections; locate and interact with nearby Loft/Ann Taylor's retail locations; access product information; create and manage user accounts; and explore seasonal promotions and special offers. When users interact with the Websites by navigating pages, clicking links, entering data, or ordering products, they communicate directly to Defendant.

48.    Defendant chooses to place the Tracking Tools on the Websites such that when users visit the Websites, both first-party and third-party cookies are placed on users' devices and/or monitored for and transmitted those cookies to Tracking Entities, combined with parameters, metadata, and detailed Request URLs, i.e., users' Sensitive Information. Because

20

Defendant controls the Websites' software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

49.     Defendant's explanation as to its use of Tracking Tools on the Websites is contained in the Websites' substantially identical Cookie Banners:

> Our website uses cookies and tracking technologies to improve performance, personalize advertising and web experiences, and share content to social media. Click Manage Preferences to learn more, to opt out of some cookies, or to manage how we or third parties collect, use, and share your non-essential cookies and similar technologies. If you do not toggle off Advertising and Functional Cookies you agree to (i) use and storage of cookies and tracking technologies as described in our Privacy Policy, and (ii) our Terms of Use. If you make no selection, your cookie settings will remain unchanged.[17]

50.     Once users click "Manage Preferences" and navigate to the Cookie Settings, the Cookie Settings state that users can reject non-necessary cookies, including performance, functional, and targeting cookies, and allow only "**Strictly Necessary Cookies**."

51.     The Cookie Settings further represent that "**Advertising Cookies**" are used across the Websites for analytics and marketing purposes, and to share and sell personal data for cross-context advertising:

> **Advertising Cookies**
>
> Targeting/Advertising Cookies/Do Not Sell or Share for Cross-Context Advertising [sic] We and our third party advertising, analytics, social media, and similar partners may collect data from visitors through cookies in order to personalize your experience, including to serve you targeted content and ads.
>
> Under certain circumstances, the collection of personal information through these cookies may be considered "sales", [sic] "sharing", [sic] or "targeted advertising" under applicable laws. To opt out of selling/sharing/targeting advertising click here.

---

[17] *See Figures 1* and *7*, which depict Defendant's Cookie Banner and Cookie Settings (emphasis in original).

52. The Cookie Settings further represent that "**Functional Cookies**" are used across the Websites to provide enhanced functionality and personalization for users' interests:

**Functional Cookies**

These cookies enable the website to provide enhanced functionality and user experience (for example, to remember choices you make when using our site). They may be set by us or by third party providers whose services we have added to our pages.

53. The Cookie Settings further represent that "**Strictly Necessary Cookies**" are necessary for the Websites to function and cannot be toggled off:

**Strictly Necessary Cookies**

These cookies are necessary for the website to function and cannot be switched off in our systems.

54. The Cookie Settings on the Ann Taylor Website further represent that "**Performance Cookies**" are used to improve the performance of the website:

These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies [sic] we will not know when you have visited our site, and will not be able to monitor its performance.

55. Defendant's representations in the Websites' Cookie Banners and Cookie Settings clearly inform users that their detailed browsing activity and interactions with the Websites would *not* be captured and transmitted to the Tracking Entities via the Tracking Tools, which are capable of aggregating and monetizing that information across multiple websites, when users affirmatively rejected all but strictly necessary cookies.

## III. The Websites' Cookie Banners Misled Users

56. When users visited the Websites, the Websites immediately displayed the Cookie Banners, which among other representations, informed users that the Websites "use[] cookies and

22

tracking technologies to improve performance, personalize advertising and web experiences, and share content to social media."[18]

57.    The Cookie Banner presented users with a button labeled "Manage Preferences," which purports to allow users "to learn more, to opt out of some cookies, or to manage how we or third parties collect, use, and share your non-essential cookies and similar technologies,"[19] as well as hyperlinks to Defendant's Privacy Policy and Terms of Use.

Our website uses cookies and tracking technologies to improve performance, personalize advertising and web experiences, and share content to social media. Click Manage Preferences to learn more, to opt out of some cookies, or to manage how we or third parties collect, use, and share your non-essential cookies and similar technologies. If you do not toggle off Advertising and Functional Cookies you agree to (i) use and storage of cookies and tracking technologies as described in our Privacy Policy, and (ii) our Terms of Use. If you make no selection, your cookie settings will remain unchanged.

---

[18] *See Figures 1* and *7*, which depict Defendant's Cookie Banners and Cookie Settings.
[19] *Id.*



*Figure 7 –The Loft and Ann Taylor websites' Cookie Settings, representing that users can manage the use of cookies, the sharing, or the sale of personal data*

58. Users of either Website who selected the "Manage Preferences" option were presented with the Cookie Settings. The Cookie Settings on the Websites, while different in their appearance, both represented that users could control how their Sensitive Information was collected and shared by accepting only "Strictly Necessary Cookies."

59. After users declined all cookies other than those strictly necessary and saved their preferences, users were permitted to continue browsing the Websites. At that point, the Cookie Banners and Cookie Settings windows disappeared.

60. The representations included in Defendant's Cookie Banners and Cookie Settings led Plaintiffs, and would reasonably lead all similarly situated users of Defendant's Websites, to believe that they had successfully disabled all but strictly necessary cookies via their express rejection of Advertising Cookies, Performance Cookies, and the sale and/or sharing of their personal information. Plaintiffs acted on those representations by interacting with the Websites after making privacy selections that were clearly and reasonably intended to prevent the use of any Tracking Tools other than strictly necessary cookies.

61. These representations were false. Defendant did not abide by Plaintiffs' expressed preferences and does not abide by users' expressed preferences. When users choose to decline all Tracking Tools other than those strictly necessary for the Websites' functionality, they clearly communicate that they do not consent to the placement or transmission of Tracking Tools other than those strictly necessary for functionality. Nevertheless, Defendant continued to cause the Tracking Tools, including advertising cookies, to be placed or otherwise accessed on users' browsers and devices so that Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

62.     The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as an unlawful wiretap, pen register, and trap and trace device when executed because they enable Tracking Entities, separate and distinct parties from Defendant, to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. The Tracking Entities are not mere passive tools or instruments of Defendant; they collect, analyze, and use the intercepted communications for their (and Defendant's) monetary gain.

**IV.     Defendant's Websites Use Tracking Tools to Spy on Users**

63.     Defendant operates the Websites and has installed Tracking Tools on the Websites created by Tracking Entities. These Tracking Tools operate invisibly, tracking Websites users' activity surreptitiously by intercepting users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

64.     Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant, like adding a product to the shopping cart or loading specific webpages, are triggered. Defendant added parameters to events that determine just how much data is collected, and how specific that data is.

65.     Parameters are strings of text that website owners add to a URL to track and organize their webpages.[20]

66.     URL parameters include key-value pairs formatted as "key=value."

        a.      The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

---

[20] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited Feb. 17, 2026).

b.      The "value" is the specific setting or data for that parameter (e.g., "yellow"

or "AddToCart" for a user taking the action of adding a product to their

online shopping cart)



*Figure 8 - Diagram of a URL displaying how parameters function*[21]

## A.      Google Ads

67.      Google Ads, formerly AdWords, is an advertising platform developed by Google

that allows advertisers to bid to display advertisements, service offerings, product listings, or

videos to web visitors.

68.      The process for advertisers using Google Ads to display ads within Google search

results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the

website to place within the Google search results; (ii) advertisers then choose keywords, usually

related to their business or target audience, intended to trigger their ads to appear within the

visitor's search results;[22] (iii) Google then allows advertisers to bid on those various keywords;[23]

---

[21] *Id.*

[22]    *Reach    the    right    people    with    Search    ads*,    GOOGLE    ADS,
https://ads.google.com/home/campaigns/search-ads/ (last visited Jan 07, 2026).

[23] *Id.*

(iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

69.     Google AdSense works in conjunction with the Google Ads bidding system and allows website owners, like Defendant, to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[24] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

70.     AdSense for content or AdSense for search are methods by which AdSense functions.[25] In either configuration, AdSense matches advertisements to website visitors based on the content of the website and visitor activity.

71.     Google Ads intercepted Plaintiffs' browsing activity, as depicted below. This interception occurred through visitors' browsers as communications were sent and/or received on visitors' devices.

---

[24] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Jan 6, 2026).
[25] *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan 07, 2026).





*Figure 9 Google Page Ads intercepting users' communications with the Websites*







*Figure 10 - Google Page Ads intercepting users' search for "Blue Jeans"*

72.    Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

73.    Through Google AdSense, Google aggregates viewing data collected from website visitors. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in visitor behavior, Google gains insight into what visitors view and what they are interested in. That insight supports service improvements, product development, and revenue growth.

74.    Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[26] Google uses data on how visitors interact with websites to train its algorithms to provide more accurate and relevant search results.[27] For example, when a visitor

---

[26] Elle Pool Sidell, *What Does Google Do With Your Data?* AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited Jan 07, 2026).
[27] *Id.*

clicks on a particular link ad spends more time on that page, Google treats that interaction as a signal of relevance to that visitor's interests. By aggregating such data across visits, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[28]

75.    Google profits in several ways from the Websites' use of the Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a visitor clicks or views an ad (depending on their chosen method, the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate visitor viewing data allows Google to further tailor its products to advertisers and visitors by training its algorithms on large volumes of data.

### B.    Salesforce (Einstein API)

76.    Salesforce is an agentic enterprise company that helps business grow by integrating all aspects of their business in a single platform. One of the software tools offered by Salesforce is the Einstein API ("Einstein"), which is used to track shopper activity.[29] Einstein collects data from users on the Websites, allowing Salesforce and the Websites to create a profile for each individual user and create personalized product recommendations for them.[30]

---

[28] *Id.*

[29] *Einstein Activities* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-activities?meta=Summary (last accessed on April 14, 2026).

[30]    *Einstein    Profile    Connector*    SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-profile-connector?meta=Summary (last accessed on April 14, 2026).

77.     The Einstein API tracks and intercepts events on the Websites, sending events such as viewProduct, and addtoCart back to Salesforce.[31] These events track the actions users take on the Websites.

78.     The Einstein API identifies users, and builds individual profiles for them, by associating them with unique ids. Users who visit a website are assigned a unique uuid cookie that associates them and their website communications with a personalized profile.[32] Users who are logged into a website are also assigned a unique cookieId and userId, which are set as first-party cookies.[33]

79.     Defendant has implemented Einstein on the Websites and uses it to build personalized profiles for Websites users. The use of Einstein on the Websites can be seen in the figures below:

---

[31]     *Einstein Activity Usage* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/usage.html (last accessed on April 14, 2026).

[32]     *UuidParam* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-profile-connector?meta=type%3AUuidParam (last accessed on April 14, 2026).

[33]     *Send Profile Data* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/send-profile-data.html (last accessed on April 14, 2026).







*Figure 11 –Einstein on the Websites*

35



*Figure 12 – The "AddtoCart" event from Einstein*

80.    The figures show Einstein tracking users on the Websites, and building profiles

for them using the userId, emailId, and uuid cookies. These first-party cookies, third-party cookies

and Einstein, continued to be placed and intercept users' communications with the Websites even

after users chose to decline all cookies that were not functional. These cookies are not necessary,

but are instead used for marketing purposes.

**V.    Defendant's Conduct Violated the Federal Wiretap Act and CIPA**

81.    Courts analyze claims under Cal. Penal Code § 631 under the same framework

applied to claims under the federal Wiretap Act. *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110,

127 (N.D. Cal. 2020)

82.     Cal. Penal Code § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a communication while it is in transit; and (3) using or communicating information obtained through such interception. Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts.

83.     Similarly, the federal Wiretap Act prohibits the intentional interception[34] of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

**A.      Defendant Intercepted the Contents of Communications in Transit**

84.     Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

85.     Here, the network requests intercepted by the Tracking Entities included detailed Request URLs containing the names and file locations of webpages, the products users browsed on the Websites, identifying information in the form of cookies, and users' activity information indicating users' commercial activity and purchases.

86.     The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Websites. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiffs' browsers and transmitted data at the moment Plaintiffs submitted information through the Websites.

---

[34] "[I]ntercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

87. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices and therefore occurred while the communications were in transit.

88. The Tracking Entities were third parties to Plaintiffs' communications with Defendant, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

89. Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Websites, in violation of CIPA at Cal. Penal Code § 631 and the federal Wiretap Act at 18 U.S.C. § 2511(1)(a).

**B.      Defendant Aided and Abetted Third-Party Interceptions**

90. A party violates Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a) not only by directly intercepting communications, but also by knowingly permitting, procuring, or facilitating third-party interception. *See, e.g., Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) ("[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap.");

91. Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Websites, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Websites.

92. CIPA at Cal. Penal Code § 631(a) requires the prior consent of all parties to the communication.

93. The federal Wiretap Act at 18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

39

94.     Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept those communications, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining valid prior consent from Plaintiffs and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data.

**C.      The Tracking Tools are Trap and Trace and/or Pen Register Devices.**

95.     California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

96.     California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

97.     The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, the Tracking Tools are "trap and trace" devices.

98.     The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify:

40

(i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

99. Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of digital fingerprinting and de-anonymization.

100. The CIPA at California Pen. Code § 637.2 imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

101. Defendant did not obtain Plaintiffs' or the Class Members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

### D. Defendant Promised Users that Tracking Could Be Disabled, but Continued Tracking Anyway

102. When users visit Defendant's Websites, they are presented with a Cookie Banner and Cookie Settings that state that users can reject all Tracking Tools (, including those from the Tracking Entities) and consent only to strictly necessary cookies that are ostensibly required for the Websites' respective functionality.

103. The Cookie Settings provides toggles and controls that allow users to decline Tracking Tools that are not necessary for the Websites to function.

104. Users who reject all tracking and the sale or sharing of their data and consent only to strictly necessary cookies reasonably believe that tracking will stop. The Cookie Settings communicate that users can prevent their browsing activity from being shared with Tracking Entities through the use of the toggle options displayed in the Cookie Settings.

105. Defendant's representations are false.

41

106.    Even after users rejected all tracking and the sale or sharing of their data and consented only to strictly necessary cookies, Defendant continued deploying Tracking Tools that intercepted users' interactions with the Websites and transmitted those communications and identifiers to third-party tracking companies.

107.    Users were told they could disable tracking, attempted to disable it, and the Defendant continued tracking them anyway.

**E.    Defendant Lacked Consent and Misrepresented the Effectiveness of the Websites' Cookie Settings**

108.    Plaintiffs' investigation revealed that the Websites' default settings permitted tracking to begin as soon as users arrived on the Websites, before users could click "Manage Preferences" on the Cookie Banner.

109.    As a result, users were tracked from the moment they began using the Websites, without prior consent.

110.    Plaintiffs visited the Websites while those default tracking settings were active.

111.    Users who visit the Websites are shown a Cookie Banner offering the option to manage their cookie preferences to opt out of some cookies.



*Figure 13 – The Cookie Banner shown to users who visit the Websites*

112.    Despite those representations, even users who declined all tracking and the sale or sharing of their data and consented only to strictly necessary cookies continued to be tracked by at least Google and the Salesforce.









*Figure 14- GoogleAds tracking a user on the Websites who declined all tracking, data sharing, and cookies other than Strictly Necessary Cookies*

**Headers** | Payload | Preview | Response | Initiator | Timing | Cookies

▼ General

Request URL: https://p.cquotient.com/pebble?tla=bjbk-Loft&activityType=viewProduct&callback=CQuotient._act_callback0&cookieId=bcMUVCYTUpPnPOLapsuNA319uS&userId=d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6&emailId=d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6&product=id%3A%3A586193%7C%7Csku%3A%3A32860566%7C%7Ctype%3A%3A%7C%7Calt_id%3A%3A&realm=BJBK&siteId=Loft&instanceType=prd&locale=default&oldUserId=CjUIIwImaBt2yxcHLQydEdM94n1OJF6LIVAZosMIxI8%3D&referrer=https%3A%2F%2Fwww.loft.com%2Fon%2Fdemandware.store%2FSites-Loft-Site%2Fdefault%2FPX-Show%3Furl%3DaHR0cHM6Ly93d3cubG9mdC5jb20vb24vZGVtYW5kd2FyZS5zdG9yZS9TaXRlcy1Mb2Z0LVNpdGUvZGVmYXVsdC9Qcm9kdWN0LVNob3c%3D&currentLocation=https%3A%2F%2Fwww.loft.com%2Fclothing%2Ftops%2FcatI000011%2Fperfect-tank%2F586193.html%3Fdwvar_586193_color%3D9000%26dwvar_586193_size%3D600%26pid%3D586193%26priceSort%3DDES&__cq_uuid=eff17460-27f7-11f1-a3b3-85a1cac8b9de&__cq_seg=0~0.24!1~0.14!2~-0.23!3~0.28!4~-0.09!5~0.01!6~0.35!7~0.26!8~0.77!9~-0.11&__fbp=fb.1.1776112892368.60576568716392442898&bc=%7B%22bjbk-Loft%22%3A%5B%7B%22id%22%3A%22586193%22%2C%22sku%22%3A%2232860566%22%7D%5D%7D&ls=true&_=1776116043137&v=v3.1.3&fbPixelId=__UNKNOWN__

Request Method: GET

Status Code: 🟢 200 OK

Remote Address: 34.217.255.157:443

Referrer Policy: strict-origin-when-cross-origin

▶ Response headers (9)

▼ Request Headers

:authority: p.cquotient.com

:method: GET

:path: /pebble?tla=bjbk-Loft&activityType=viewProduct&callback=CQuotient._act_callback0&cookieId=bcMUVCYTUpPnPOLapsuNA319uS&userId=d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6&emailId=d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6&product=id%3A%3A586193%7C%7Csku%3A%3A32860566%7C%7Ctype%3A%3A%7C%7Calt_id%3A%3A&realm=BJBK&siteId=Loft&instanceType=prd&locale=default&oldUserId=CjUIIwImaBt2yxcHLQydEdM94n1OJF6LIVAZosMIxI8%3D&referrer=https%3A%2F%2Fwww.loft.com%2Fon%2Fdemandware.store%2FSites-Loft-Site%2Fdefault%2FPX-Show%3Furl%3DaHR0cHM6Ly93d3cubG9mdC5jb20vb24vZGVtYW5kd2FyZS5zdG9yZS9TaXRlcy1Mb2Z0LVNpdGUvZGVmYXVsdC9Qcm9kdWN0LVNob3c%3D&currentLocation=https%3A%2F%2Fwww.loft.com%2Fclothing%2Ftops%2FcatI000011%2Fperfect-tank%2F586193.html%3Fdwvar_586193_color%3D9000%26dwvar_586193_size%3D600%26pid%3D586193%26priceSort%3DDES&__cq_uuid=eff17460-27f7-11f1-a3b3-85a1cac8b9de&__cq_seg=0~0.24!1~0.14!2~-0.23!3~0.28!4~-0.09!5~0.01!6~0.35!7~0.26!8~0.77!9~-0.11&__fbp=fb.1.1776112892368.60576568716392442898&bc=%7B%22bjbk-Loft%22%3A%5B%7B%22id%22%3A%22586193%22%2C%22sku%22%3A%2232860566%22%7D%5D%7D&ls=true&_=1776116043137&v=v3.1.3&fbPixelId=__UNKNOWN__

:scheme: https

Accept: */*

Accept-Encoding: gzip, deflate, br, zstd

Accept-Language: en-US,en;q=0.9

**Headers** | Payload | Preview | Response | Initiator | Timing | Cookies

▼ General

Request URL: https://p.cquotient.com/pebble?tla=bjbk-AnnTaylor&activityType=viewProduct&callback=CQuotient._act_callback0&cookieId=bc8KozIE1pqM4xxsiBTfQPoULa&userId=d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6&emailId=d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6&product=id%3A%3A845902%7C%7Csku%3A%3A38612350%7C%7Ctype%3A%3A%7C%7Calt_id%3A%3A&realm=BJBK&siteId=AnnTaylor&instanceType=prd&locale=default&oldUserId=CjUIIwImaBt2yxcHLQydEdM94n1OJF6LIVAZosMIxI8%3D&referrer=https%3A%2F%2Fwww.anntaylor.com%2Fclothing%2Ftops-and-blouses%2Fcata000010%2Fruffle-collar-shirt%2F845902.html%3Fdwvar_845902_color%3D9192%26dwvar_845902_size%3D500%26pid%3D845902%26priceSort%3DDES&currentLocation=https%3A%2F%2Fwww.anntaylor.com%2Fclothing%2Ftops-and-blouses%2Fcata000010%2Fruffle-collar-shirt%2F845902.html%3Fdwvar_845902_color%3D9192%26dwvar_845902_size%3D500%26pid%3D845902%26priceSort%3DDES&__cq_uuid=eff17460-27f7-11f1-a3b3-85a1cac8b9de&__cq_seg=0~-0.61!1~-0.49!2~-0.00!3~-0.30!4~-0.03!5~0.24!6~-0.32!7~-0.01!8~0.31!9~-0.19&__fbp=fb.1.1776116619535.203794618143220533&bc=%7B%22bjbk-AnnTaylor%22%3A%5B%7B%22id%22%3A22%22845902%22%2C%22sku%22%3A%2238612350%22%7D%5D%7D&ls=true&_=1776119020314&v=v3.1.3&fbPixelId=__UNKNOWN__

Request Method: GET

Status Code: 🟢 200 OK

Remote Address: 35.85.165.125:443

Referrer Policy: strict-origin-when-cross-origin

▶ Response headers (9)

▼ Request Headers

:authority: p.cquotient.com

:method: GET

:path: /pebble?tla=bjbk-AnnTaylor&activityType=viewProduct&callback=CQuotient._act_callback0&cookieId=bc8KozIE1pqM4xxsiBTfQPoULa&userId=d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6&emailId=d8c8d3479032d55866764bc5aa88d8e9e4108c809debf3155ab71487514e1da6&product=id%3A%3A845902%7C%7Csku%3A%3A38612350%7C%7Ctype%3A%3A%7C%7Calt_id%3A%3A&realm=BJBK&siteId=AnnTaylor&instanceType=prd&locale=default&oldUserId=CjUIIwImaBt2yxcHLQydEdM94n1OJF6LIVAZosMIxI8%3D&referrer=https%3A%2F%2Fwww.anntaylor.com%2Fclothing%2Ftops-and-blouses%2Fcata000010%2Fruffle-collar-shirt%2F845902.html%3Fdwvar_845902_color%3D9192%26dwvar_845902_size%3D500%26pid%3D845902%26priceSort%3DDES&currentLocation=https%3A%2F%2Fwww.anntaylor.com%2Fclothing%2Ftops-and-blouses%2Fcata000010%2Fruffle-collar-shirt%2F845902.html%3Fdwvar_845902_color%3D9192%26dwvar_845902_size%3D500%26pid%3D845902%26priceSort%3DDES&__cq_uuid=eff17460-27f7-11f1-a3b3-85a1cac8b9de&__cq_seg=0~-0.61!1~-0.49!2~-0.00!3~-0.30!4~-0.03!5~0.24!6~-0.32!7~-0.01!8~0.31!9~-0.19&__fbp=fb.1.1776116619535.203794618143220533&bc=%7B%22bjbk-AnnTaylor%22%3A%5B%7B%22id%22%3A22%22845902%22%2C%22sku%22%3A%2238612350%22%7D%5D%7D&ls=true&_=1776119020314&v=v3.1.3&fbPixelId=__UNKNOWN__

:scheme: https

Accept: */*

Accept-Encoding: gzip, deflate, br, zstd

Accept-Language: en-US,en;q=0.9

Cache-Control: no-cache





*Figure 15- Salesforce tracking a user the Websites who declined all tracking, data sharing, and cookies other than Strictly Necessary Cookies*

113.     Defendant intentionally placed and allowed to be placed Google and Salesforce tracking cookies on the Websites and allowed Google and Salesforce to track users and intercept their communications with the Websites, despite stating in the Cookie Settings that advertising cookies would not be placed if users rejected tracking and the sale or sharing of their data and consented only to strictly necessary cookies.

114.     Defendant placed, and allowed to be placed, the "NID" cookie from Google and the "uuid" cookie from Salesforce. These cookies identify users and allow the Tracking Entities to track users, intercept their communications, and build personal profiles based on that tracking.

115.     Representations regarding cookie-consent controls are materially misleading where tracking continues despite a website's claim to the contrary and/or users' opt-out selections.

116.     Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[35]

117.     The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[36]

---

[35]      *[GA4] User Explorer* GOOGLE, https://support.google.com/analytics/answer/9283607?sjid=14886665613386572022-NA#zippy=%2Cin-this-article (last visited Mar. 24, 2026); *Send Profile Data* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/send-profile-data.html (last accessed on February 20, 2026).

[36]      *See Data sharing settings*, GOOGLE (July 29, 2024), https://support.google.com/analytics/answer/1011397?hl=en&ref_topic=2919631&sjid=14886665613386572022-NA (last visited Mar. 24, 2026); *Send Profile Data* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/send-profile-data.html (last accessed on February 20, 2026).

48

## CLASS ALLEGATIONS

118.   Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclasses (collectively "the Class").

119.   Plaintiffs bring this class action individually and on behalf of the following Class:

**Class:** All natural persons who visited Defendant's Websites in the United States during the applicable limitations period, who interacted with the Websites' Cookie Settings, rejected all non-essential cookies, and consented only to strictly necessary cookies, and whose electronic communications were intercepted, disclosed, and/or transmitted to the Tracking Entities through Defendant's use of the Tracking Tools (the "Nationwide Class").

120.   Plaintiff Callan brings this class action individually and on behalf of the following California Subclass:

All members of the Nationwide Class who visited and interacted with Defendant's Websites during the applicable limitations period while located in the State of California (the "California Subclass").

121.   Plaintiff Horton brings this class action individually and on behalf of the following Ohio Subclass:

All members of the Nationwide Class who visited and interacted with the Defendant's Websites during the applicable limitations period while located in the State of Ohio (the "Ohio Subclass").

122.   Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

49

123.    Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

124.    NUMEROSITY: At this time, Plaintiffs do not know the number of Class Members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Websites. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

125.    COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

    a.    Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

    b.    Whether Defendant obtained effective and informed consent to do so;

    c.    Whether Defendant's conduct constitutes a violation of the Wiretap Act and/or analogue state wiretap statutes;

    d.    Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties; and

    e.    Whether the Class members are entitled to injunctive relief.

126.    TYPICALITY: As persons who visited Defendant's Websites and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the Class members.

127.    ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

128.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATIONS OF THE WIRETAP ACT**
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

129.    Plaintiffs incorporate the allegations in paragraphs 1–132 by reference as if fully set forth herein.

130.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

131.    The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

51

132. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

133. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

134. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

135. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

136. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

137. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

138. The Tracking Tools embedded on Defendant's Websites constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

139. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Websites, including the pages they viewed, searches conducted via the Websites, browsing activity, shopping-related interactions, and other

interactions with Websites features, particularly where Defendant represented through its Cookie Banners, Cookie Settings, and Privacy Policy that users could decline non-essential cookies.

140. The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication.

141. A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

142. Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Websites without their consent.

143. Within the relevant time period, Plaintiffs' electronic communications with the Websites were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the Internet and used for advertising, analytics, and marketing optimization.

144. Interception occurred whenever Plaintiffs interacted with the Websites, including when they navigated webpages, used search or location features, viewed electronics, placed an order, or otherwise communicated information to the Websites through their browsers.

145. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the

Tracking Tools on its Websites and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

146.    Plaintiffs did not consent to the interception, recording, disclosure, or use of their electronic communications with the Websites by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined non-essential cookies and declined third-party tracking through Defendant's cookie-preference interface

147.    The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Websites. *See* 18 U.S.C. § 2511(1)(a).

148.    Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Websites and allowed them to intercept the communications of users on the Websites, in order to subsequently disclose those communications to the Tracking Entities. Those disclosures were made fraudulently, based on Defendant's false representations in the Cookie Banners and Cookie Settings, and were an invasion of privacy.

149.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c.    reasonable attorneys' fees and costs.

## COUNT II
### COMMON LAW INVASION OF PRIVACY
#### Intrusion Upon Seclusion
#### (On Behalf of Plaintiffs and the Nationwide Class)

150.    Plaintiffs incorporate the allegations in paragraphs 1–132 by reference as if fully set forth herein.

151.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

152.    Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Nationwide Class by, among other things, permitting Tracking Tools to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of such collection.

153.    Plaintiffs and the Nationwide Class Members maintained a reasonable expectation that their communications with Defendant via the Websites would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[37] Plaintiffs expected that their interactions with the Websites would not be shared with third-party analytics providers.

154.    Plaintiffs and the Nationwide Class Members relied on Defendant's representations and exercised the Websites' opt-out controls, reasonably expecting that Defendant would honor its affirmative representations in the Cookie Banners and Cookie Settings that users

---

[37] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that colling and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

could opt out of the sale/sharing of personal information, decline non-essential cookies, and consent only to strictly necessary cookies.

155.    Despite Plaintiffs' and the Nationwide Class Members' opt-outs, Defendant permitted Tracking Entities to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed users' profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

156.    Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express opt-outs.

157.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Nationwide Class Members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

158.    Plaintiffs and the Nationwide Class Members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, statutory and punitive damages where available, and injunctive relief to prevent further unlawful tracking.

**COUNT III**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiff Callan and the California Subclass)**

159. Plaintiff Callan incorporates the allegations in paragraphs 1–132 by reference as if fully set forth herein.

160. Plaintiff Callan brings this cause of action on behalf of herself and all California Subclass members.

161. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

162. California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative."

163. In support of Proposition 11, voters stated that:

The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

164. Plaintiff Callan and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications. Plaintiff Callan and California Subclass members' protected interests arise from various statutes and common law, including, inter alia,

57

the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

165. The privacy rights of Plaintiff Callan and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff Callan and the California Subclass members.

166. Plaintiff Callan and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Websites and thereby providing and/or transmitting their Sensitive Information.

167. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Tracking Entities despite users' opt-outs, Defendant violated their reasonable expectation of privacy.

168. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

169. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff Callan and the California Subclass members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

**COUNT IV**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff Callan and the California Subclass)**

170.    Plaintiff Callan incorporates the allegations in paragraphs 1–132 by reference as if fully set forth herein.

171.    Plaintiff Callan brings this cause of action on behalf of herself and all California Subclass members.

172.    CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

173.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

59

174. The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

175. In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see also Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

176. The Websites, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here. *See* Cal. Penal Code § 631(a).

177. Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff Callan and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate Cal. Penal Code § 631.

178. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

60

179.    Plaintiff Callan and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitutes invasions of privacy of Plaintiff's and the California Subclass members' respective rights to privacy.

**COUNT V**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638.51**
**(On Behalf of Plaintiff Callan and the California Subclass)**

180.    Plaintiff Callan incorporates the allegations in paragraphs 1–132 by reference as if fully set forth herein.

181.    Plaintiff Callan brings this cause of action on behalf of herself and all California Subclass members.

182.    California's Pen Register and Trap and Trace Law is part of CIPA, codified at Cal. Penal Code §§ 630.50-638.55

183.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

184.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

185.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

61

186.    Cal. Penal Code § 638.51(a) provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order . . . ."

187.    No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Websites by deploying Tracking Tools designed to capture phone numbers, email addresses, routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Websites.

188.    Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiff Callan and the California Subclass members' activity on the Websites.

189.    Defendant did not obtain consent from Plaintiff Callan or the California Subclass members before using pen register or trap and trace technology to identify users of its Websites, and has violated Section 638.51.

190.    As a direct and proximate result of Defendant's conduct, Plaintiff Callan and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 638.51.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA CONSUMER**
**LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1770, et seq.**
**(On Behalf of Plaintiff Callan and the California Subclass)**

191.    Plaintiff Callan incorporates the allegations in paragraphs 1–132 by reference as if fully set forth herein.

192.    Plaintiff Callan brings this cause of action on behalf of herself and all California Subclass members.

193.    The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

194.    Defendant is a person within the meaning of the CLRA.

195.    Plaintiff Callan is a consumer of Defendant's services under the CLRA, as Plaintiff used Defendant's Websites to browse products.

196.    Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the presence of the Tracking Tools on the Websites. Defendant violated Cal. Civ. Code § 1770(a)(2) by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

197.    By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(5) by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

198.    By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(14) by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

199.    Defendant's failure to disclose was material to Websites users, such as Plaintiff Callan. Users could have chosen a different website that did not use Tracking Tools, chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled, and/or chosen a website that requested consent before implementing Tracking Tools.

200.    Plaintiff Callan and California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VII**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, et seq.**
**(On Behalf of Plaintiff Callan and the California Subclass)**

201.    Plaintiff Callan incorporates the allegations in paragraphs 1–1832 by reference as if fully set forth herein.

202.    Plaintiff Callan brings this cause of action on behalf of herself and all California Subclass members.

203.    The UCL broadly prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice." *See* Cal. Bus. & Prof. Code § 17200.

204.    By actively and affirmatively misleading consumers by omitting to inform them of the Tracking Tools on the Websites, Defendant has violated the unlawful prong of the UCL.

205.    Defendant has violated the unlawful prong of the UCL by way of Defendant's above-described violations of the Wiretap Act and  CIPA arising from Defendant's purposeful installation and utilization of the Tracking Tools on the Websites.

206.    By actively and fraudulently deceiving users about their ability to disable the Tracking Tools, Defendant has violated the unlawful prong of the UCL.

207.    Defendant failed to disclose the presence of the Tracking Tools on the Websites. Defendant disclosed Plaintiff Callan and the California Subclass members' Sensitive Information

64

without their knowledge or consent. Defendant disclosed Plaintiff Callan and the California Subclass members' information to the Tracking Entities to build personal profiles without their knowledge or consent. Defendant failed to disclose that it was wiretapping users' communications with the Websites. Defendant fraudulently deceived users about their ability to disable the Tracking Tools. Through this conduct, Defendant violated the unfair prong of the UCL.

208.     Plaintiff has standing to bring claims against Defendant under the UCL. Plaintiff Callan's information was tracked and recorded without consent. Plaintiff Callan's data was used to build personal profiles for advertising purposes without consent.

209.     Plaintiff Callan would have considered it important to the decision to visit Defendant's Websites to know that her data was being tracked and recorded without her consent, and regardless of privacy elections made through the Cookie Banner and Cookie Settings.

210.     Instead, Plaintiff Callan exercised the Websites' privacy controls and continued using the Websites in reliance on Defendant's representations that non-essential tracking had been disabled and that Plaintiff Callan's information would not be shared with Tracking Entities.

211.     Because of Defendant's UCL violations described above, Plaintiff suffered injury by losing control of her personal data and having her Sensitive Information tracked and recorded without her consent.

212.     Plaintiff Callan and California Subclass members seek all available relief for Defendant's use of unfair acts or practices, including injunctive relief.

**COUNT VIII**
**VIOLATION OF THE OHIO WIRETAP ACT**
**OH ST § 2933.52**
**(On Behalf of Plaintiff Horton and the Ohio Subclass)**

213. Plaintiffs incorporate the allegations in paragraphs 1–132 by reference as if fully set forth herein.

214. Plaintiff Horton brings this cause of action on behalf of herself and all Ohio Subclass Members.

215. The Ohio Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* OH ST § 2933.52.

216. The Ohio Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." OH ST §2933.65.

217. The Ohio Wiretap Act defines "intercept" as "he aural or other acquisition of the contents of any wire, oral, or electronic communication through the use of an interception device." OH ST § 2933.51(C).

218. The Ohio Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of the communication." OH ST § 2933.51(G).

219. The Wiretap Act defines "electronic communication" as "a transfer of a sign, signal, writing, image, sound, datum, or intelligence of any nature that is transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system." OH ST § 2933.51(N)

220. The Ohio Wiretap Act defines "person" to include an individual, corporation, business trust, estate, trust, partnership, and association. OH ST § 1.59(C).

221.    Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Ohio Wiretap Act.

222.    The Tracking Tools embedded on Defendant's Websites constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of OH ST § 2933.51(D).

223.    Plaintiff had a reasonable expectation of privacy in their electronic communications with Defendant's Websites, including the pages they viewed, searches conducted via the Websites, browsing activity, shopping-related interactions, and other interactions with Websites features, particularly where Defendant represented through its Cookie Banners, Cookie Settings, and Privacy Policy that users could decline non-essential cookies and allow only strictly necessary cookies.

224.    The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication.

225.    A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

226.    Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Websites without their consent.

227.    Within the relevant time period, Plaintiffs' electronic communications with the Websites were intercepted contemporaneously at the moment they were sent by the Tracking

Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiff from across the Internet and used for advertising, analytics, and marketing optimization.

228. Interception occurred whenever Plaintiff interacted with the Websites, including when she navigated webpages, used search or location features, viewed electronics, placed an order, or otherwise communicated information to the Websites through her browser.

229. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Websites and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

230. Plaintiff did not consent to the interception, recording, disclosure, or use of their electronic communications with the Websites by the Tracking Entities. To the contrary, Plaintiff affirmatively declined non-essential cookies and declined third-party tracking through Defendant's cookie-preference interface

231. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Websites. *See* OH ST § 2933.52(A).

232. Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Websites and allowed them to intercept the communications of users on the Websites, in order to subsequently disclose those communications to the Tracking Entities. Those disclosures were made fraudulently, based on Defendant's false representations in the Cookie Banner, and were an invasion of privacy.

68

233.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under OH ST § 2933.65, including:

        d.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or;

        e.    statutory damages of the greater of $200 per day per violation or $10,000; appropriate equitable and declaratory relief; and;

        f.    reasonable attorneys' fees and costs.

**COUNT IX**
**COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION**
**(On Behalf of Plaintiffs and the Nationwide Class)**

234.    Plaintiffs incorporate the allegations in paragraphs 1–132 by reference as if fully set forth herein.

235.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

236.    Defendant made affirmative representations to users through its Cookie Banner, Cookie Settings, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

237.    Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

238.    Defendant made these representations at the time users first accessed the Websites and again when users were prompted to review and confirm their cookie preferences.

239.    These representations were false and misleading. Before users, including Plaintiffs and the Nationwide Class Members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise decline all non-essential cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Nationwide Class Members' Sensitive Information and transmit the same to the Tracking Entities, despite Defendant's representation in the Cookie Settings that it would not track users until they consented to the Tracking Tools.

240.    Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Websites' source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

241.    Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Websites so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

242.    Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

243.    Plaintiffs and the Nationwide Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Websites and by exercising the opt-out controls instead of avoiding the Websites, withholding information, or taking additional steps to protect their privacy.

244.    Plaintiffs' and the Nationwide Class members' reliance was reasonable because Defendant presented the Cookie Banners and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

245.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Nationwide Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs and the Nationwide Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

246.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

247.    Plaintiffs and the Nationwide Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## COUNT X
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

248.    Plaintiffs incorporate the allegations in paragraphs 1–132 by reference as if fully set forth herein.

249.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class members.

250.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Nationwide Class members' Sensitive Information, which

71

Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

251.    It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

252.    Plaintiffs and the Nationwide Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Nationwide Class members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Nationwide Class members are entitled to the relief set forth below.

**PRAYER**

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.    An order certifying the class and making all appropriate class management orders;

b.    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Class and Subclasses and their counsel as Class Counsel;

c.    For an order declaring the Defendant's conduct violates the statutes and common law referenced herein;

d.    For an order finding in favor of Plaintiffs, the Nationwide Class, the California Subclass, and the Ohio Subclass on all counts asserted herein;

e.    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Websites or (ii) add, and obtain, the appropriate consent from Websites users;

f.    An award of statutory damages or penalties to the extent available;

g.    For damages in amounts to be determined by the Court and/or jury;

72

h.    For pre-judgment interest on all amounts awarded;

i.    For an order of restitution and all other forms of monetary relief;

j.    An award of all reasonable attorneys' fees and costs; and

k.    Such other and further relief as the Court deems necessary and appropriate.

Dated: April 14, 2026                    **LEVI & KORSINSKY, LLP**

By: */s/ Mark S. Reich*
Mark S. Reich (MR-4166)
Gary Ishimoto*
Mark Jensen*
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: mjensen@zlk.com

*Attorneys for Plaintiffs and the Proposed Class*

**pro hac vice* forthcoming